Jason R. Hull [11202]
jhull@mohtrial.com
Anikka T. Hoidal [16489]
ahoidal@mohtrial.com
**MARSHALL OLSON & HULL, PC**
Newhouse Building
Ten Exchange Place, Suite 350
Salt Lake City, Utah 84111
Tel: (801) 456-7655

*Attorneys for Plaintiff*

*Pro Hac Vice Forthcoming*

Aaron Siri*
aaron@sirillp.com
Elizabeth A. Brehm*
ebrehm@sirillp.com
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Ste 500
New York, NY 10151
Tel: (888) 747-4529

Michael Connett*
mconnett@sirillp.com
**SIRI & GLIMSTAD LLP**
700 S. Flower St., Suite 1000
Los Angeles, CA 90017
Tel: (888) 747-4529

---

## THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| **BRIANNE DRESSEN,**<br>**Plaintiff,**<br><br>**v.**<br><br>**ASTRAZENECA AB; ASTRAZENECA PHARMACEUTICALS LP; and VELOCITY CLINICAL RESEARCH, INC.,**<br><br>**Defendants.** | **COMPLAINT WITH JURY DEMAND**<br><br><br>   **Case Number 2:24-cv-337**<br><br>**Judge _____** |

Plaintiff Brianne Dressen, by counsel, files this Complaint against the above-named Defendants and alleges as follows:

### <u>INTRODUCTION</u>

1.      On the morning of November 4, 2020, Brianne Dressen ("**Bri**") was the picture of good health, enjoying an active and athletic life with her husband and two young children.

2.  At 39 years of age, Bri was an avid rock climber, hiker, snowboarder, wakeboarder, and snowshoer. She and her husband, Brian, met through their mutual love of rock climbing, enjoying their first date on top of Mount Olympus.

3.  Bri had always wanted to be a mother and a teacher, and, by 2020, she had the good fortune of being both: a preschool teacher, and the mother of two young children. Bri was busy, a good kind of busy: teaching her preschoolers every day; taking her children to soccer games, swim lessons, and piano practices; and planning weekend outings for the family.



4.      In 2020, the COVID pandemic was raging, and Bri did her best to make the unknowns of the pandemic a little less scary for her children and preschoolers.

5.      As with many other Americans, Bri and her husband, a chemist for the US Army, were hopeful that the development of COVID vaccines would help stop the spread of the novel virus.

6.      In the fall of 2020, Bri heard there was going to be a clinical trial in nearby Salt Lake County for an experimental COVID vaccine made by the pharmaceutical company AstraZeneca.

7.      Bri wanted to do her part to help with the development of the vaccine. So, on November 4, 2020, she drove to the company's Salt Lake clinic.

8.      When she got to the clinic, Bri was given a consent form that spelled out the procedures she would need to undergo if she participated (e.g., a physical exam, nasal swabs, pregnancy test, blood draws, saliva samples, etc.), the potential side effects that could occur, and what would happen in the event she suffered a serious adverse reaction during the trial.

9.      Importantly, the consent form promised that AstraZeneca would "cover the costs" if a participant suffered a "research injury," including but not limited to medical bills. In a section titled "Compensation for study related injury," the consent form stated:

> If you become ill or are injured while you are in this research study, you must tell your study doctor straight away. The study doctor will **provide medical treatment or refer you for treatment**. . . .
>
> The Sponsor has an insurance policy to **cover the costs of research injuries** as long as you have followed your study doctor's instructions. **Sponsor will pay the costs of medical treatment for research injuries**, provided that the costs are reasonable, and you did not cause the injury yourself.

10.     With these reassurances should something go wrong, Bri signed the form, rolled up her sleeve, and let the drug company inject the experimental product into her arm. Her mind was at peace, as Bri believed she was doing the right thing for her country, her students, and her family.

11.     But things quickly took a turn. Bri's right arm began tingling and prickling within an hour of the shot. It was a condition called paresthesia, as Bri would soon learn.

12.     Bri figured the paresthesia was temporary. But it did not go away. Instead, it spread over the next few hours: first to her right shoulder, then to her left arm.

13.     Bri still thought this was just a fleeting effect. But that evening other progressively worrying symptoms emerged: blurred vision, double vision, headache, sound sensitivity, a loud ringing in the ears (tinnitus), nausea, vomiting, fever, and chills.

14.     By morning, the fever and chills had passed, but the other symptoms remained and were getting worse.

15.     Over the next few weeks, the paresthesia spread to Bri's legs, she lost 20 pounds from the persistent vomiting, her eyes became acutely sensitive to light, her ears became acutely sensitive to sound, an electric shock sensation coursed through her body, and her heart would randomly begin sprinting at a rate that made her feel a short breath away from fainting, or worse.

16.     As Bri recalls:

> I walked into the clinic fine, and walked out the beginning of a nightmare I wouldn't wish on my worst enemy. My little girl's voice was too painful for my ears. My little boy's hand was too painful for touch. There was no break, no reprieve, no escape. No answers, no help, only questions, and fear of what was overtaking my body more and more each day as new symptoms piled on. The raging tinnitus came on, freight train in one ear, and a high-pitched sound. I was so nauseous 24/7, like the worst kind of pregnancy nausea that never stops. I couldn't keep food down. I was a completely hollowed out version of who I once was.

4

17.    Bri's friends, family, and doctors did everything they could to help her manage the terrifying onset of symptoms. As Bri describes:

> My long-time friends would come sit in the darkness with me, unable to touch me, unable to talk because all of my sensory facets were on overdrive, my heart had a mind of its own. They were as helpless as I was, but they didn't want me to suffer alone. I would just sit there with tears rolling down my face, quietly asking if this would stop at some point…would it end?

18.    Fast forward three years and Bri is still disabled. While some of the acute symptomology has improved, she remains a shadow of her former self: unable to work, unable to do any athletic activity, unable to parent the way she had, and unable to drive more than a few blocks at a time.

19.    Throughout it all, Bri has had to navigate this terrifying new world without any assistance or support from AstraZeneca and its research team. As described by Bri: "I did everything they asked of me. I honored my obligations to them. They have not honored any. When they needed me, I was there, I cooperated. When I needed them, they were nowhere to be found."

20.    Despite promising to **"provide medical treatment or refer you for treatment,"** AstraZeneca ignored every one of Bri's repeated pleas for help and guidance. As Bri recounts:

> I called the test clinic early on with tears running down my face, begging them to help me. They said the drug company would call back any day now. Nightmarish days turned into weeks, and those nightmarish weeks turned into months, and now years. That call never came. As time passed by, my doctors kept asking for guidance from the drug company, "what does the drug company say?" I did not have an answer, because AstraZeneca never shared any information or referrals with me, let alone provided care, to help me through this situation.

21.    Despite promising **"to cover the costs of research injuries,"** AstraZeneca ignored numerous requests for support before finally offering the paltry sum of $1,243.30—a minuscule

fraction of the medical bills and lost wages, among other financial costs, that Bri had incurred and will continue to incur.

22.     Worse, AstraZeneca conditioned its offer of $1,243.30 on Bri agreeing to release the company of all further financial responsibility for her care.

23.     Bri was receiving medical treatment when she got AstraZeneca's insulting request: an IV drip infusing her blood with a biweekly medication that had a price tag of $3,500 per session, or nearly three times the total amount AstraZeneca had just offered for *all* of her past and future bills.

24.     Bri's husband, who was by her side, replied to AstraZeneca's request: "The way we have been and continue to be treated is simply appalling."

25.     AstraZeneca's callousness increased the trauma of an already traumatizing situation. As Bri learned, "I was nothing more than a number to AstraZeneca. I was not a mom with kids who desperately needed their momma, or a teacher with dozens of little kids depending on me to make the unknowns of this new Covid world less scary. I was not a wife to a man who wanted nothing more than for the love of his life to be ok. To them I was nothing."

26.     With no guidance or support from the drug company or its test clinic, Bri and her husband went from one doctor to the next to figure out what was going on with her body, racing to the emergency room when the symptoms became too much to bear.

27.     Doctors struggled to determine how to treat Bri's condition, but there was little doubt about what caused it. The diagnosis can be found throughout Bri's medical records: "Vaccine Reaction," "Vaccine side effect," "Immunization reaction," "likely side effect due to an

increased immune response to the vaccine," "post-vaccine polyneuritis," and "covid vaccine injury."

28.     Bri's husband reached out to a neurologist from the National Institute of Health ("NIH"), who expressed an interest in Bri's situation and invited her to come to the NIH's state-of-the-art campus in Bethesda, Maryland for extensive testing and treatment.

29.     In June 2021, seven months after receiving AstraZeneca's experimental vaccine, a team of NIH neurologists diagnosed Bri as having "Post Vaccine Neuropathy."

30.     As a result of this neuropathy, Bri has developed a debilitating disordering of her autonomic nervous system ("dysautonomia"), including "chronic inflammatory demyelinating polyneuropathy" or "CIDP," a condition in which the myelin sheaths that protect the nerve cells are stripped away. The net result is a myriad array of constant, abnormal, and painful sensations, including the feeling of an electric shock coursing in her body.

31.     Since receiving AstraZeneca's experimental vaccine, Bri's need for medical care and medication has skyrocketed, going from one family doctor to a team of specialists, including neurologists, immunologists, allergists, and dieticians. One of Bri's current medications comes with a price tag of $432,000 a year, although her insurance company has been able to negotiate this down (at least for now) to $119,000 per year.

32.     Bri is aware that COVID vaccines, including AstraZeneca's experimental vaccine, are subject to the federal Public Readiness and Emergency Preparedness Act ("**PREP Act**"). *See* 85 Fed. Reg. 52, 15198. Because of this, Bri is aware she cannot bring a product liability action against AstraZeneca like she could if it were a standard pharmaceutical.

33.     But this is not a product liability action.

34.     Plaintiff's cause of action does not sound in tort or strict liability; it sounds in the law of contract, and, specifically, the breach of contractual obligations that Defendants knowingly and voluntarily entered into to induce Bri and others into participating in the clinical trial.

35.     Any immunity that Defendants may have had under the PREP Act was waived, at least for purposes of a contract action, when they voluntarily assumed contractual obligations.

36.     Plaintiff thus brings this breach of contract action to recover all available damages, both economic and non-economic, that resulted from Defendants' breaches of their promises.

### PARTIES

37.     Plaintiff Brianne Dressen ("**Bri**") resides in Saratoga Springs, Utah with her husband, Brian, and two young children.

38.     Defendant AstraZeneca AB is a corporation incorporated in Sweden. Its principal place of business is in London, England.

39.     Defendant AstraZeneca Pharmaceuticals, LP is a limited partnership organized in the State of Delaware. Upon information and belief, its principal place of business is in Wilmington, Delaware and its partners are not citizens of or domiciled in Utah.

40.     In 2020, Defendants AstraZeneca AB and AstraZeneca Pharmaceuticals LP (collectively, "**AstraZeneca**") developed an experimental COVID vaccine.

41.     AstraZeneca's COVID vaccine was ultimately never licensed for public use in the United States. The authorization for using AstraZeneca's COVID vaccine in Europe was withdrawn at the request of AstraZeneca by the European Medicines Agency effective May 7, 2024. In total, AstraZeneca's sales of its COVID vaccine totaled over $5.8 billion.

42.    Defendant Velocity Clinical Research, Inc. (hereafter, "**Velocity**") is a corporation incorporated in the State of Delaware. Its principal place of business is in Durham, North Carolina.

43.    Defendant Velocity carried out the clinical trial of AstraZeneca's COVID vaccine.

44.    Upon information and belief, Velocity was an agent of AstraZeneca at all times material to this case.

## JURISDICTION AND VENUE

45.    This Court has subject matter jurisdiction over this matter because the parties are completely diverse in citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. 28 U.S.C. § 1332(a)(1).

46.    This Court has personal jurisdiction over each Defendant because they purposefully availed themselves of the privilege of conducting activities within Utah by, *inter alia*, contracting with Utah residents to take part in a clinical trial, and conducting the clinical trial in Utah.

47.    Venue is proper in this Court because the contract giving rise to Plaintiff's claims was entered into at Defendant Velocity's office in Salt Lake County and the clinical trial was conducted at said office. 28 U.S.C. § 1391(a)(2).

## STATEMENT OF FACTS

### The Informed Consent Form

48.    Defendants had and continue to have access to information about the AstraZeneca vaccine that was, and is, not available to the public, or medical community, and had, and continue to have, access to extensive resources, medical professionals, and scientists on their staff.

49.    Defendants recognized and understood that AstraZeneca's vaccine could cause side effects in some people, and that some of these side effects could be "severe."

9

50.     In the consent form that Defendants drafted, which study subjects were required to review and sign before participating in the study, Defendants stated:

a.  "With any vaccination there is a risk of rare serious side effects, such as an allergic reaction."

b.  "There is a chance you could have a side effect that is severe or that has not been seen before."

c.  "If you have severe side effects from the vaccine, the study doctor may ask you not to get a second dose of vaccine or placebo."

d.  "Getting this vaccine may also involve risks to your health that we don't know about right now."

e.  "If you suffer any of these side effects (or any others not listed) or you think you are experiencing a side effect, during this study, please tell your study doctor immediately."

f.   "If you have a reaction after the injection of vaccine, your participation may be stopped by the study doctor or sponsor without your consent."

g.  "Your study doctor or the sponsor may withdraw you from the study without your consent . . . if you have a serious side effect related to the vaccine."

Exhibit A ("**Consent Form**"), at 3, 9, 10, 12, & 14.

51.     On November 6, 2020, two days after Bri received the vaccine, Defendants amended the consent form to indicate that AstraZeneca's vaccine may cause "neurological disorders," including "demyelinating disease," and that these conditions can "cause substantial disability," including death, "if not treated promptly." To quote:

    a.   "Neurological disorders (demyelinating disease) that affect the peripheral and central nervous system (CNS) may occur. They may cause substantial disability, and some can be fatal if not treated promptly."

    b.   "If you develop neurologic symptoms like abnormal sensations, muscle weakness or blurred vision, you should promptly notify your healthcare provider and the study team."

Exhibit B ("**Amended Consent Form**"), at 12-13.

52.    Although not specifically disclosed in either the Consent Form or the Amended Consent Form, Defendants considered effects on the "brain and nerves, blood and blood vessels, [and] the immune system" to be "adverse events of special interest."

53.    Defendants also recognized that study subjects may suffer emotional distress, including "mental, or emotional injury," as well as "fear of physical, mental, or emotional injury." Exhibit A, at 13.

**Defendants' Offer**

54.    Given the time, discomfort, and potential for serious side effects that participation in the trial entailed, Defendants – via the Consent Form and Amended Consent Form – offered certain written promises to those who agreed to participate.[1] These promises included:

    a.   Financial reimbursement for each completed visit to the test clinic for physical exams, blood draws, and vaccine administration;

---

[1] The original Consent Form and Amended Consent Form are word-for-word identical with respect to the terms of compensation for research injuries, as well as all other matters that are quoted in this Complaint, with the exception of the information on neurological disorders. As discussed above, the information on neurological disorders was only provided in the Amended Consent Form.

      b.   Financial reimbursement for each completed phone call related to the study; and

      c.   Compensation for study related injury.

Exhibit A, at 12-13.

55.     In the section of the Consent Form titled "Compensation for study related injury," Defendants promised that the study doctor would **"provide medical treatment or refer you for treatment"** in the event that a research injury occurred. *Id.* at 12 (emphasis added).

56.     Defendants also promised that AstraZeneca "has an insurance policy to **cover the costs of research injuries** as long as you have followed your study doctor's instructions." *Id*. at 13 (emphasis added).

57.     Defendants defined "research injuries" as "[i]njuries that have been caused by the vaccine, tests or procedures." *Id.* By contrast, "[i]njuries caused by your usual medical care are not research injuries." *Id*.

58.     With respect to medical costs, Defendants promised that "Sponsor <u>**will**</u> **pay the costs of medical treatment for research injuries**, provided that the costs are reasonable, and you did not cause the injury yourself." *Id.* (emphasis added).

59.     Defendants' promise to pay for medical care in the event of a research injury was expressly *not* conditioned on the study subject remaining in the study. To quote:

      a.   "If you decide not to take part in this study, **it will not affect your ability to receive medical care**. Your decision to not participate or to withdraw later will not result in any penalty or loss of benefits to which you are otherwise <u>**entitled**</u>." *Id.* at 4 (emphases added).

b. "Your decision to withdraw your Authorization or not to participate **will not involve any penalty or loss of access to treatment or other benefits to which you are otherwise underlined_entitled**." *Id.* at 19-20 (emphasis added).

60. In addition to promising to pay for the costs of injury, the consent form provides that "Sponsor may also compensate you in accordance with the law of the United States," and that "[b]y signing this form you do not give up any legal right you may have." *Id.* at 13.

61. The discussion of compensation in the consent form concludes by noting that an unspecified "order" issued by the federal government "**may limit** your right to sue if you are injured or harmed while participating" in the study. *Id.* at 13 (emphasis added).

62. Upon information and belief, the order that is referenced in the consent form is the *Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against Covid-19* that the Secretary of the U.S. Department of Health and Human Services published on March 17, 2020, in the Federal Register. *See* 85 Fed. Reg. 52, 15198.

63. The March 17, 2020 order bars certain personal injury actions against Defendants. It has no bearing, however, on the enforceability of **contractual obligations** that Defendants knowingly and willfully entered into with study subjects, including Bri.

**Plaintiff's Acceptance of Defendants' Offer**

64. On November 4, 2020, Bri visited Defendants' test clinic in Salt Lake County for the first time.

65. During her visit, Bri was provided with a copy of the Consent Form that set forth, *inter alia*, the requirements for study participants, information about the potential risks and benefits

of the vaccine, and Defendants' promises about compensation in the event of a research injury, as described above.

66.     The Consent Form that Bri was provided on November 4, 2020, did not contain a warning about neurological disorders, including demyelinating diseases. Defendants added that warning to the Amended Consent Form two days later, on November 6.

67.     Based on the information contained in the Consent Form, including Defendants' promises to take care of things if something went wrong, Bri agreed to participate in the trial.

68.     Bri confirmed her agreement by signing the Consent Form, rolling up her sleeve, and allowing Defendants' agent to inject the experimental substance into her arm.

69.     At the moment the substance entered Bri's blood, a solemn contract had been formed. Her performance was complete and Defendants' promises were irrevocable.

### Plaintiff's Research Injury

70.     Almost immediately after the test substance was injected into her body, Bri began experiencing a tingling and prickling feeling in her right arm, a condition called paresthesia. By the evening, the paresthesia had spread to Bri's left arm and she began noticing other worrying symptoms, including a headache, blurred vision, double vision, a loud ringing in her ears ("tinnitus"), nausea, fever, and a sensitivity to sound.

71.     By morning, the fever had passed, but the other symptoms remained and continued to intensify.

72.     Bri did not know it at the time, but November 5, 2020, the day after she received AstraZeneca's experimental vaccine, was the last day that she would teach her preschool students.

73.    By November 7, 2020, the paresthesia had spread to Bri's legs and her symptoms were so severe that Bri checked into the emergency room at Utah Valley Hospital: the first of four ER visits she would need to make over the next month. Dr. Craig Patten, the doctor who cared for her during this first visit, listed Bri's diagnosis as a "vaccine reaction."

74.    Bri was back in Utah Valley Hospital's emergency room on November 11, 2020, with progressive worsening of her headache, nausea, tinnitus, and sound sensitivity. Due to the nausea and associated vomiting, Bri had lost 10 pounds in just 7 days.

75.    The next day, November 12, 2020, Bri visited Ryan McQuivey, a nurse practitioner at Utah Valley Neurological. As with the emergency room doctor, McQuivey diagnosed Bri as having an "immunization reaction." Per McQuivey's notes:

> [M]y suspicion is this is actually a reaction to her recently given vaccine given the very acute nature immediately after as well as unremarkable imaging by MRI of her brain, C, and T spines and also normal lumbar puncture results.

76.    Bri's healthcare providers, including McQuivey, were at a loss as to how to treat her condition, and the symptoms continued to worsen.

77.    On November 17, 2020, Bri visited Utah Valley Ear Nose Throat & Allergy to seek help for her acute sensitivities to light and sound. Dr. Thaddeus Abbott noted Bri was "wearing sunglasses and ear plugs" during the visit and that she had recently started to experience tachycardia (a fast heart rate) which might require emergency room care for "acute treatment." As with Dr. Patten and McQuivey, Dr. Abbott agreed Bri was experiencing "a likely side effect due to an increased immune response to the vaccine."

78.    Two days later, on November 19, 2020, Bri's husband rushed her to the emergency room once again after she began experiencing pain in the left side of her chest and an acute tachycardic episode.

79.    A few days later, Bri visited her primary care clinic to address the continued worsening of her symptoms. The medical record states: "Due to her progression of symptoms, I recommended that they present to the ED at the U of U for further evaluation with possible inpatient admission due to progression of symptoms." The first recommendation listed is: **"Go directly to U of U ED."** Bri's husband acted accordingly and brought Bri back to the emergency room, where she was admitted and stayed for 3 days.

80.    On December 11, 2020, Bri visited another neurologist, Dr. Neil Patel. In his notes on the visit, Dr. Patel stated: "given the unusual nature of her symptoms and presentation in association with COVID-19 trial vaccination I think multidisciplinary involvement is vital."

81.    And on and on it went for months, with Bri and her husband going from doctor to doctor, desperately looking for a way to get Bri back to her previous good health. All the while mounting a steadily growing pile of medical bills, lost wages, and child-care expenses.

82.    The first positive breakthrough came in 2021 when Bri was invited by a team of neurologists at the National Institute of Health ("**NIH**") to visit NIH's Bethesda, Maryland campus to undergo testing for vaccine-related neuropathy.

83.    In June 2021, Bri visited NIH's campus for what the NIH described as "persistent neurological symptoms following SARS-CoV2 vaccine."

84.     NIH's testing confirmed that Bri had suffered nerve damage, memory impairment, and postural orthostatic tachycardia syndrome ("**POTS**"). Based on these findings, NIH neurologists diagnosed Bri as having "Post-Vaccine Neuropathy."

85.     NIH's neurologists explained Bri's neuropathy was most likely the result of an immunological reaction to the vaccine (i.e., an "immune-mediated neuropathy"). Because of this, NIH's neurologists gave her an IVIG treatment[2] during her stay.

86.     The IVIG treatment that Bri received at the NIH campus was the first treatment she had received, in the seven months since suffering her vaccine injury, that provided some (but far from complete) reprieve from her torturous symptoms.

87.     When Bri returned home from her NIH visit, she immediately began trying to secure access to additional IVIG treatments, but it was not until October 2021 that her insurance company agreed to cover the costs. She was unable to afford to pay for it out of pocket. Since then, Bri has been receiving biweekly infusions, first through IV injections (IVIG) and more recently through subcutaneous injections (SCIG). These treatments have become a critical part of Bri's medical care, and she will need them forevermore.

88.     Others who have received COVID vaccines, including other study subjects in AstraZeneca's clinical trial, have suffered a similar neurological disorder as Bri. The disorder, which is well described in the medical literature, has been termed Post Acute Covid Vaccine Syndrome ("**PACVS**").

89.     The following are statements from the peer-reviewed medical literature:

---

[2] IVIG stands for intravenous immunoglobin. It is a well-established, FDA-approved treatment for immune mediated neurological disorders.

a. "After the coronavirus vaccine, neurological complications can occur, both in the central and peripheral nervous systems."

b. "COVID-19 vaccine-associated peripheral and central neuroimmunological disorders have been well described."

c. "Our case series highlights that acute small fiber neuropathy can follow COVID-19 vaccination and lead to chronic complications."

d. "Clinicians and patients should be aware of the potential for post-vaccination CNS inflammatory syndromes associated with COVID-19 vaccine administration."

e. "Delayed diagnosis of PACVS may result in a delay in appropriate treatment and the prolongation of disabling symptoms. Patients and physicians should be made aware of PACVS to improve diagnostic and therapeutic management in terms of patient and healthcare system costs."

90. According to Dr. Janet Woodcock, FDA's Acting Commissioner during the peak of the COVID pandemic, the COVID vaccine caused "serious" and "life changing" reactions in some people.

91. In AstraZeneca's own clinical trial, the company found "a noticeable imbalance in the frequency of unsolicited [Adverse Events] in the Nervous System Disorder class between the [vaccine group] and the control group," with significantly more in the former. Although most of the trial data will not be released by the FDA because the vaccine was never licensed in the United States, it is known that several of the study participants in the vaccine group of AstraZeneca's trial

developed demyelinating diseases, including transverse myelitis and chronic inflammatory demyelinating polyneuropathy.

92.     As a result of Bri's vaccine-induced demyelinating disease, she now lives every day with constant disabling pain. She is unable to work, unable to drive more than a few blocks, and unable to fully care and provide for her two children. In her own words:

> The internal vibrations are still with me every single waking second of the day. They are sharp tingling sensations that move from my heart through my whole body. Those nice moments sitting with my kids – with them just happy to have some time with mom, – in my head I have to just remind myself to breathe through the nightmarish sensations and put a smile on my face and pretend everything is fine and that I am actually enjoying just being there with them… but the reality is those moments have been robbed from me for the rest of my life. Those feelings of peace, safety, and love can't happen with that much constant pain and discomfort. I don't want my kids to worry so I just keep it all to myself and bury it as much as I can, but it's obvious my pretending doesn't always work. They know I am not able to do what their friends' moms can do.
>
> My heart doesn't beat right, my chest is sore all the time. My legs and hands are getting weaker every winter. Food sensitivities are still really bad. I am living a completely different life. Without my family, without question, I would be gone…would've been gone a long time ago. They are amazing and deserve so much better than this.

### Defendants' Broken Promises (The Breach)

93.     The contractual breach in this case is not that Bri suffered a vaccine reaction on November 4, 2020. The breach is that, once this reaction occurred, Defendants refused to honor their contractual obligations to provide medical care/referrals and cover the costs of the injury.

94.     On the morning after she received the vaccine, Bri called and left a voice message with Velocity's test clinic to report the symptoms she was experiencing. The clinic called back and asked Bri to come in for an evaluation, which she did on November 6, 2020.

95.     At the end of the November 6 evaluation, Velocity's lead investigator, Dr. Barabra Rizzardi, told Bri she may have Multiple Sclerosis ("MS"). Dr. Rizzardi told Bri to go to a neurologist and get tested for MS.

96.     At the November 6 evaluation, Dr. Rizzardi did not offer further medical care, but stated she would contact AstraZeneca and ask for their input.

97.     Subsequent testing and consultations with doctors over the next two weeks – none of it paid for by AstraZeneca – ruled out MS as a cause of Bri's condition.

98.     While continuing to suffer severe symptoms, on November 18, 2020, Bri went to the test clinic for a second evaluation. Bri, who was in acute physical distress when she entered the clinic, was told she needed to sign the Amended Consent Form before she could be seen by the clinic staff.

99.     The amended version of the Consent Form contained a disclosure that AstraZeneca's vaccine may cause "neurological disorders," including "demyelinating disease," and these disorders "may cause substantial disability, and some can be fatal if not treated promptly." Exhibit B, at 12-13.

100.     After signing the Amended Consent Form, Bri was disappointed to learn that the clinic was limiting its assessment to whether she had COVID. The staff performed two nasal swab tests and a blood draw to test for COVID, and then sent Bri home to await the results.

101.     During the visit, and in subsequent phone calls, Bri and her husband pleaded for help in treating her condition. Each time, the test clinic representatives stated that AstraZeneca's neurologists would be reaching out to Bri to discuss. But, despite these repeated assurances, AstraZeneca's neurologists never once reached out.

102.    As the weeks passed without any care, guidance, or referrals from AstraZeneca, Bri and her husband were forced to navigate the nightmare on their own.

103.    On November 24, 2020, after being checked into the emergency room, doctors asked Bri to find out from Velocity if she was administered the vaccine or a placebo. Bri's husband promptly called the clinic, and he was told by a Velocity representative that the company would check with AstraZeneca and report back.

104.    The next day, the clinic called Bri in the emergency room to inform her she had received the vaccine, not the placebo. During the call, the Velocity representative told Bri she would not be getting the second dose due to her reaction to the first dose.

105.    Bri reiterated her plea for help during this call and was told again that AstraZeneca would be reaching out.

106.    On December 17, 2020, Bri's husband emailed Velocity with recommendations from a German scientist, Dr. Harald Preuss, for certain laboratory testing that could be helpful. Velocity never responded.

107.    On January 15, 2021, Bri's husband emailed Velocity "the first batch of payment records related to Brianne's treatment for her adverse reaction" to the vaccine. Velocity did not respond.

108.    On February 9, 2021, Bri's husband followed up on his January 15 email: "Checking on updates for this. . . . When may we expect payment?" Later that day, Susan Thompson, Velocity's Site Director, emailed back: "I am sorry you have not heard anything as of yet. Hopefully I get an answers [sic] soon. I will reach out again today."

109.    No reimbursement came.

110.     On March 12, 2021, having lost Bri's income, and facing a growing and potentially

limitless number of future medical bills, the Dressens applied for a refinancing of their home. The

application was approved, and the Dressens received an equity loan on their home on March 17,

2021.

111.     On March 18, 2021, Bri's husband emailed Thompson: "I'd like to know when we

can expect the first payment on Brianne Dressen's medical bills? Two months since submitting . .

. . Expect another round soon, do I send them to you, or is there a more effective/efficient way to

make this happen?" Thompson responded: "as far as I know for now send them to me and I will

forward them on. I am forwarding on right now and as a follow up too."

112.     On March 24, 2021, Bri emailed Thompson with a follow-up: "Hey this is Brianne

Dressen. Can you advocate a bit for us here help us get a timeline for payment? I am still not doing

well, we have had to hire for after school childcare. We really need this money."

113.     The next day, March 25, 2021, Thompson responded: "Hi Brianne, I am escalating

this for you. I do not understand either why it is taking so long. I am trying again. I am hopeful we

should hear something soon!! I am so sorry it has taken so long!!"

114.     On April 4, 2021, Bri emailed for an update: "Just following up. Have you heard

from them?" Thompson responded: "I was told they were all being processed. Still have not heard

anything at all?? I will follow up again. I am so sorry for the delay."

115.     Three weeks passed. No reimbursement.

116.     On April 21, 2021, Bri's husband called and spoke with Thompson. During the call,

Brian explained the mounting childcare costs they were incurring due to Bri's debilitating

condition. Thompson said to include these costs in the next submission of bills, which Brian did shortly after the call.

117.    In his April 21, 2021 email, Brian included the child care costs, "the next set of medical bills" and a copy of the Consent Form, noting: "Our attorney advised us to remind you of the compensation for injury section which I have highlighted."

118.    On April 22, 2021, Thompson responded: "I have forwarded your request." Thompson emailed again the following day: "I am hoping we hear something by next week!! Again I am so sorry this is taking so long. I have written again."

119.    Two more weeks passed. No reimbursement.

120.    On May 3, 2021, Bri followed up with a short email: "Any updates?" Thompson responded: "I am checking again. I am sorry!!"

121.    Eleven more days passed. No reimbursement.

122.    On May 14, 2021, Bri emailed Thompson: "I now need contact information for those individuals/company that would be party to legal proceedings. Absent that information, I will have to provide your names to my attorneys."

123.    On May 17, 2021, Thompson responded: "I have made some progress with AstraZeneca and will be receiving the names for you with their legal contact. I am waiting to hear back. I received that notice today so it should not be long at all. Again I apologize for the long delay. We should have some more information hopefully by tomorrow."

124.    A few minutes after receiving this email, Bri responded: "For clarification, last update states that approval for the first payment was eminent. Is this no longer the case?" Thompson responded: "I have heard there is a payment coming out but I am not sure of the exact

amount. I really am hopeful that we have an answer for you tomorrow. I just heard back from one of the project leads that it is coming."

125.    Three more weeks passed. Still no reimbursement.

126.    On June 9, 2021, Bri emailed: "Following up on this. Do I need to just get my lawyer going on this?" Velocity did not respond.

127.    Four more weeks passed. No reimbursement.

128.    On July 8, 2021, Bri emailed: "This has been 8 horrible months. Advocating for myself as a sick person to get the study sponsor to pay for medical bills that they repeatedly agreed to pay … is truly callous and inhumane. I know for them that is not very much money … but for us, that is. I appreciate your pro-active help on this matter." Velocity did not respond.

129.    On July 13, 2021, the local news channel KMYU aired a story on Bri's vaccine-induced neurological disorder and the continuing problems she was experiencing as a result.

130.    That same day, shortly after the KMYU program aired, Heather Holtman, Velocity's Manager of Clinical Operations, called the Dressens and told them a payment of $590.20 would be deposited in their account. Bri and her husband stated this was far less than the costs they had incurred, and they would only accept the $590.20 payment if AstraZeneca confirmed that additional payments would be forthcoming.

131.    Within a few hours of the July 13, 2021 phone call, Defendants deposited $590.20 on Bri's "ClinCard" – an online portal set up for study subjects. Immediately upon receiving this deposit, Bri's husband emailed Holtman:

> We just got notice that $590.20 was loaded onto the clincard. As we discussed, this is far less than what we submitted and I forwarded the bills again that I had sent to Susan in April, shortly after our call. **We discussed that I did not wish payment to be made unless it**

> **was confirmed by AstraZeneca that future payments would also be made.** Please confirm that you received the additional documents and that AstraZeneca promised future payment.

(emphasis in original).

132.    Six days later, Holtman responded: "I just wanted to touch base and let you know I have sent the additional medical records to AZ for approval to pay. I have not heard back from them yet but hope to this week. I will be in touch soon."

133.    On August 12, 2021, Bri emailed Holtman for an update: "Following up on this: Where are we at?" Holtman did not respond.

134.    Bri did not hear anything from AstraZeneca or Velocity for the next three months.

135.    On November 10, 2021, Bri emailed Holtman for an update. Holtman did not respond.

136.    In December of 2021, a news reporter named Brooke Conrad contacted Velocity about their failure to pay Bri for the costs of her injury. Velocity responded to the reporter with an email, stating that it "will work closely with [Bri] on any future requests."

137.    Contrary to Velocity's public assurance, Holtman emailed the Dressens on December 17, 2021, with a request to relieve AstraZeneca of all future financial responsibility for Bri's medical care in exchange for just $1,243.30.

138.    In the December 17, 2021 email, Holtman stated: "Here is the latest from AstraZeneca. If you could sign this and send it back we can get you paid."

139.    The statement that Holtman asked Bri to sign read as follows:

> I, Subject 20053220048, hereby accept the sum of $1,243.30 in full and final settlement of any and all claims for reimbursement of any costs, including medical expenses, arising from or in connection with AZD1222 and study D8110C00001 (the "Matter"). There are

no other outstanding balances, costs, or invoices related to the Matter, and I waive any additional claims related to the Matter. I acknowledge that this payment is made without admission of liability and that all claims I have brought or could have brought in relation to the Matter are hereby extinguished.

140.    Bri had an IV drip in her arm, at a specialty infusion center, when she and Brian

received Holtman's email. Brian replied by sending a photograph of Bri and the following

message:

This is my wife right now, getting $3500 worth of an infusion that she gets every two weeks, more than a year after her NIH diagnosed VACCINE INJURY. We sent velocity clinic research documents of medical bills far in excess of the $1700 this equates to…

We have a contract stating that they will cover medical bills, we have been waiting for this long to be insulted like this?

The way we have been and continue to be treated is simply appalling.

Finally mad…



141.    Brian tried repeatedly to get someone from Velocity on the phone that day but kept reaching voicemail. Later that afternoon, Brian sent the following email, which read in part:

> I just called your main office three times, no answer. Called your direct line. No answer. Would appreciate a call please.
>
> We have asked repeatedly for updates and haven't heard anything from you for months regarding payment or updates on my wife, Brianne's, condition. During these months of no communication from you or AstraZeneca, we continue to accrue more and more medical bills, as well as our entire family adjusting to a different life as a result of her injury. While business went on as usual for you, my wife was convincing herself every single day for over a year now that she has to learn to live with a painful electrical sensation coursing through her body all day and night. Every. Single. Day.
>
> If you were serious about my wife's case, I would expect some sort of engagement between July and now…anything well before now, over a year after her injury. Certainly not $590 hastily wired to our account without our consent in July, 8 months into her injury; then silence for months followed by a last minute letter absolving the drug company of all responsibility in exchange for $1200, 13 long months into her injury.
>
> Her life, our family's lives, will never be the same.

142.    After receiving this email, Velocity's new Site Director, Ali Turner, called Bri to address the situation. Turner followed up the next day, December 18, 2021, with an email:

> Thank you for your time on the phone yesterday and the updates you have provided. We continue to advocate for you and your health and would like to provide AstraZeneca with an update on your situation. Could you please send me a copy of all your medical expenses in whatever form you have available – be it bills, receipts, personal tracking information. I would like to forward this on to AstraZeneca immediately so that they may be in touch with you directly.

143.    On December 28, 2021, Bri's husband provided Turner with the documents she requested, including the list of provider charges for Bri's medical care, a listing of pharmaceutical

expenses, and the payments for childcare. Brian closed the email by stating: "This is an ongoing vaccine injury and costs continue to be incurred as a result."

144. After sending this email, the Dressens went back to waiting mode. It would be two and a half months before they would receive any response.

145. On March 14, 2022, Bri received an email from an unnamed AstraZeneca representative. The unnamed representative provided no contact information other than an email address of D8110C00001@astrazeneca.com.

146. In the email, the unnamed AstraZeneca representative stated: "For us to assess your claim for compensation and reimbursement of uninsured medical expenses, we will need full access to your medical records. To that end, please complete the enclosed authorization for the release of medical records and return it to AstraZeneca's mailbox, along with copies of any bills for uninsured medical expenses that you may have incurred."

147. On April 8, 2022, Bri emailed the unnamed AstraZeneca representative with billing records showing total (non-pharmacy) charges of $187,018.70, of which the insurer had paid $105,167.68 and Bri had paid $10,766.74. Bri also included a list of the 100 prescriptions that had been issued thus far to treat her symptoms. In addition, Bri attached a compilation of medical records, including the NIH's diagnosis of her condition as "Post Vaccine Neuropathy" and a November 2021 record from her neurologist, Dr. Michael Hunter, in which he stated:

> There is not a lot of data supporting treatment in this situation as there are very few people who received AstraZeneca vaccine, similar individuals have experience symptoms similar to Brianne, as per the NIH when I discussed her case with them over the phone. Some people have responded to corticosteroid monotherapy, some of [sic] responded to IVIG monotherapy, some people have responded to IVIG with recurrent dosing. At this point, she clearly has had benefit with IVIG in regard to her symptoms.

148.    On April 14, 2022, the unnamed AstraZeneca representative acknowledged receipt of the aforementioned documents.

149.    On May 4, 2022, the unnamed AstraZeneca representative emailed again, stating that Bri needed to provide the affiliation and contact information, including email, postal address, and phone number, for the 40 medical providers identified in Bri's medical records.

150.    On June 4, 2022, despite continuing to struggle to simply make it through a day, Bri emailed the unnamed AstraZeneca representative a handwritten list of the affiliation and contact information for the 40 medical providers she had seen to date. In the margin of her handwritten list, Bri wrote in pencil "My life is in shambles."

151.    In Bri's June 4 email, she included an updated accounting of her medical expenses, which now totaled $203,808.91 in provider charges for (non-pharmacy) expenses, $108,510.80 in insurance payments for (non-pharmacy) expenses, and $13,651.01 in out-of-pocket (non-pharmacy) expenses.

152.    Bri closed her June 4 email with the following reminder: "Just a reminder, these documents do not [include] future costs incurred or my ability to make future claims, as my study injury is ongoing, requiring continual treatment."

153.    On June 6, 2022, the unnamed AstraZeneca representative acknowledged receipt of Bri's email, and stated: "We will review [the documents] and reach out to you in case further information is needed."

154.    On July 18, 2022, Bri emailed the unnamed AstraZeneca representative for an update, stating "no further communication from AstraZeneca has been received" since the June 6 acknowledgment of receipt. AstraZeneca did not respond.

155. On August 12, 2022, the unnamed AstraZeneca representative emailed, stating:

Dear Brianne Lunt Dressen,

We have processed your latest consent forms received on 04JUN2022, and have requested the corresponding medical records.

We have however not received all medical records we need to make the needed assessments. Unfortunately, requesting medical records is a process that takes time. We will be back in touch once we have received these records and made our assessment.

156. On August 17, 2022, Bri received a phone call from an NIH employee informing her that AstraZeneca had rejected a package of Bri's medical records that NIH had mailed to the company. Bri immediately emailed the unnamed AstraZeneca representative to let him/her know. AstraZeneca did not respond.

157. On September 26, 2022, the unnamed AstraZeneca representative emailed Bri:

Dear Brianne Lunt Dressen,

Please be informed that the AstraZeneca Study Team has received the requested medical records. We are in the process of evaluating them and we will get back to you as soon as a decision is made regarding the claim.

Sincerely,
AstraZeneca Team

158. The Dressens waited for a response. But the unnamed AstraZeneca representative never reached out to the Dressens again. Nor did anyone else at AstraZeneca or Velocity.

159. AstraZeneca and Velocity refused to honor their obligations. No medical care, no medical referrals, no financial support.

30

160.     According to Bri, "I did everything they asked of me. I honored my obligations to them. They have not honored any. When they needed me, I was there, I cooperated. When I needed them, they were nowhere to be found."

### Plaintiff's Economic Damages

161.     The contract that Bri entered into with Defendants provided that the "costs of research injuries" would be compensated.

162.     The costs of Bri's research injury include, but are not limited to, past and future medical costs, including regular ongoing medical appointments, prescription medications, various forms of therapy, and aids for independent function.

163.     Prior to receiving AstraZeneca's vaccine, Bri was in excellent health. Her minimal medical needs could be met by occasional visits to her family doctor (Dr. Mary-Marie Sullivan) and one medication. Now, Bri's medical needs require ongoing consultations with various specialists, including an internist specializing in autonomic disorders (Dr. Craig Coleby), an autonomic and neuromuscular neurologist (Dr. Brent Goodman), immunologists (Dr. Richard Hendershot and Dr. Andrew Smith), a dietician (Dr. Amy Pham), and an allergy and immune specialist (Dr. Anne Maitland).

164.     Prior to receiving AstraZeneca's vaccine, Bri was on only one medication for a thyroid condition that had been stable for almost 10 years.

165.     Since receiving AstraZeneca's vaccine, Bri has been prescribed a seemingly endless series of medications, including IVIG, SCIG (Hizenta), Ketotifen, Desipramine, Naltrexone, Famotidine, Thyroxin, IV Solumedrol, Monoclonal antibodies, Dexamethasone, Neurontin (gabapentin), Amitriptyline, and Fioricet.

166.    Some of the drugs that Bri currently requires are very expensive. For example, the subcutaneous infusions of immunoglobin ("SCIG"), which is a critical part of Bri's care, cost $36,049.40 per month. Although Bri's insurer has been able to negotiate this price down to $9,909.82 a month, this still works out to over $118,000 a year – for just one drug.

167.    The costs of Bri's future medical costs, which will be the appropriate subject of qualified expert testimony, include the cost of therapies that will maximize the quality of Bri's life but which she has heretofore been unable to afford. This includes physical and occupational therapy, hyperbaric oxygen therapy, ozone therapy, IV saline therapy, and mental health therapy. Additionally, Bri's doctor has recently told her that she will need to begin Rituximab infusions, in addition to SCIG, with an expected price tag of $22,000 per infusion.

168.    In order to be made whole, a damages award for Bri's medical expenses will need to include all expenses paid by Bri's insurer, not just her own out of pocket expenses. This is because Bri's insurer has a contractual right to subrogation for both past and future expenditures. A damages award that only compensates Bri for her "out of pocket" expenses would be an illusory award, because said money would simply go the insurer, not to Bri.

169.    Other costs that Bri has incurred as a result of her research injury include, but are not limited to:

      a.   Past and future lost income from Bri not being able to work due to her disability;

      b.   Past and future loss of household services from Bri being unable to do the work around the house that she previously performed, including cooking and preparing food for the family; doing the laundry, cleaning the house, and taking the children to their regular activities;

c.   Past and future costs of transportation to accommodate Bri's severe limitations with driving;

d.   Past child care expenses when Bri was bedridden during the acute phase of her illness and unable to care for her children; and

e.   Attorney fees that have been, and will continue to be, incurred as a foreseeable result of Defendants breaching their duty of good faith to cover (i.e., insure) the costs of Bri's research injury.

170.   The full extent of economic damages will be the appropriate subject of qualified expert testimony at trial.

**Plaintiff's Non-Economic (Emotional) Damages**

171.   In Utah, the breaching party in a contract action is liable for emotional damages if (A) such damages were a foreseeable result of the breach, and (B) were explicitly contemplated at the time the contract was entered into. *Cabaness v. Thomas*, 2010 UT 23, ¶ 75, 232 P.3d 486 (further explained in *Gregory & Swapp, PLLC v. Kranendonk*, 2018 UT 36, ¶¶ 29-32, 424 P.3d 897). Both circumstances are present in the contract at issue here.

172.   First, the damages in this case are foreseeable for the same reasons they were foreseeable in *Beck v. Farmers Ins. Exch.,* 701 P.2d 795, 802 (Utah 1985). As the Utah Supreme Court explained, "insurance frequently is purchased not only to provide funds in case of loss, but to provide peace of mind for the insured or his beneficiaries." *Cabaness*, 2010 UT 23 at ¶ 72 (quoting *Beck*., 701 P.2d at 802).

173.   Second, the potential for emotional damages was not only foreseeable, it was explicitly contemplated in the contract as the consent form specifically identifies the potential for

"mental, or emotional injury" as well as "fear of physical, mental, or emotional injury." Exhibit A, at 13.

174.   Since both conditions set forth in *Cabaness* are present, Bri is entitled to the emotional damages she suffered as a result of Defendants' wholesale breach of their obligations.

175.   For certain health conditions, including immune-mediated neuropathies, treatment delayed is treatment denied. Defendants were expressly aware of this from the moment of Plaintiff's injury, stating in the Amended Consent Form that "neurological disorders," including "demyelinating disease," "**may cause substantial disability, and some can be fatal <u>if not treated promptly</u>**." Exhibit B, at 12-13 (emphasis added).

176.   Defendants' refusal to pay for Bri's care, or provide any guidance, has resulted in Bri repeatedly missing out on interventions, including both testing and treatment, that—had they been timely provided—would have substantially improved her condition and prognosis. Defendants' failure to provide, or pay, for timely interventions has thus contributed to Bri's physical disability, and the associated emotional distress.

177.   Bri's emotional damages include, but are not limited to, the emotional distress of suffering constant neuropathic pain as a result of the ongoing delay and denial of effective early interventions; fear and distress of sending her family into financial ruin at a time of extreme physical vulnerability; and the despair of pleading with Defendants to provide care and support in a time of extreme physical distress only to be ignored again, and again, and again, as if her life did not matter, as if she was "nothing."

### FIRST CAUSE OF ACTION
**Breach of Contract**

178.    Plaintiff incorporates the preceding paragraphs as if fully written herein.

179.    The Consent Form that Defendants drafted for the clinical trial was a unilateral offer because would-be participants had no obligation to perform. The moment, however, a participant performed, the Consent Form became a binding unilateral contract. *See Mallory v. Brigham Young Univ.*, 2014 UT 27, ¶ 23 n. 11, 332 P.3d 922 ("Unilateral offers are by definition nonbinding in that the offeree is not bound to perform if he or she chooses not to. But a unilateral offer's nonbinding nature has no bearing on whether a contract exists postacceptance. A unilateral contract *is* established if and when the offeree begins substantial performance."); *Ford v. Am. Express Fin. Advisors, Inc.*, 2014 UT 70, ¶ 11, 98 P.3d 15 ("An offer for a unilateral contract may neither be changed nor revoked once the offeree begins the performance requested by the offer." (citation omitted) (alteration in original)).

180.    Plaintiff completed substantial performance, and Defendants obtained consideration, when Plaintiff allowed the vaccine to be injected into her arm. This act constituted Plaintiff's acceptance (through performance) of Defendants' offer. At that moment, the promises in the consent form became irrevocable. *See Dahl v. HEM Pharmaceuticals Corp.*, 7 F.3d 1399 (9th Cir. 1993) (holding that a pharmaceutical company's consent form in a clinical trial became an enforceable unilateral contract once the plaintiffs submitted themselves to the experimental treatment, and arguments to the contrary "approach[] frivolousness").

181.    Once Plaintiff was injured by the vaccine, Defendants had a contractual obligation (1) to "cover the costs" of the research injury, including but not limited to medical costs; and (2) to provide medical care and/or refer Plaintiff for medical care.

182. Defendants breached both of these contractual obligations, and, in so doing, delayed and denied the provision of timely medical care.

183. Defendants understood that the failure to provide timely medical care for neurological disorders, including demyelinating disease, can cause "substantial disability" and death.

184. Plaintiff has suffered, and continues to suffer, both economic and non-economic damages, including emotional damages, as a result of Defendants' breaches, as discussed above.

185. Based on the foregoing, Plaintiff is entitled to judgment against Defendants in an amount to be determined at trial for their breaches of contract, and which far exceeds the jurisdictional threshold.

<u>**SECOND CAUSE OF ACTION**</u>
**Breach of the Duty of Good Faith and Fair Dealing**

186. Plaintiff incorporates the preceding paragraphs as if fully written herein.

187. Defendants had a duty of good faith and fair dealing in carrying out their obligations under the contract.

188. Defendants breached their duty of good faith and fair dealing through a number of actions, including but not limited to:

    a. Their unconscionable delay in responding to Bri's pleas for help, despite knowing (i) she had a severe neurological disorder and (ii) such disorders "may cause substantial disability, and some can be fatal **if not treated promptly**" (Exhibit B, at 12 (emphasis added));

36

b.  Their insulting offer of less than $2,000 to cover all past and future costs of Bri's research injury;

c.  Their attempt to condition the aforementioned miniscule compensation (which Defendants were contractually <u>obligated</u> to provide) on Bri agreeing to release Defendants from the need to provide any further compensation; and

d.  Their request that Bri sign a modified consent form **after she was injured** that disclosed, for the first time, the potential for neurological disorders, and conditioning her seeing a clinical trial doctor (during a time of acute physical distress) on her signing this form.

189.    Plaintiff has suffered, and continues to suffer, both economic and non-economic damages, including emotional damages, as a result of Defendants' breaches, as discussed above.

190.    Based on the foregoing, Plaintiff is entitled to judgment against Defendants in an amount to be determined at trial for their breaches of the duty of good faith and fair dealing, and which far exceeds the jurisdictional threshold.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brianne Dressen prays for judgment against Defendants in an amount to be determined at trial:

1.    For economic damages, including, but not limited to, past and future medical expenses, past and future loss of household services, childcare expenses, past and future lost income, and past and future transportation costs;

2.    For non-economic damages, including emotional damages, that Plaintiff foreseeably suffered as a result of Defendants' breaches;

3.      For attorney fees pursuant to controlling case law, including but not limited to *Beck v. Farmers Ins. Exch*., 701 P.2d 795, 801-02 (Utah 1985); *Canyon Country Store v. Bracey*, 781 P.2d 414, 420 (Utah 1989); *Billings v. Union Bankers Ins. Co*., 918 P.2d 461, 468 (Utah 1996); and *Pugh v. N. Am. Warranty Servs*., 2000 UT App 121, ¶¶ 13-14, 1 P.3d 570.

4.      For prejudgment interest to the extent allowed by law; and

5.      For such other and further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.

Dated this 13th day of May, 2024.

MARSHALL OLSON & HULL, PC

By:     *Jason R. Hull*
        Jason R. Hull

SIRI & GLIMSTAD LLP
        AARON SIRI*
        ELIZABETH A. BREHM*
        MICHAEL CONNETT*

*Attorneys for Plaintiff*

*Pro Hac Vice* motions forthcoming